IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


AISHIA NICOLE FORD,

        Plaintiff,

vs.                                CASE NO. 2:15-cv-05088

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

        Defendant.


**PROPOSED FINDINGS AND RECOMMENDATION**

    Pending before this Court is Plaintiff's Brief in Support of Motion for Judgment on the Pleadings (ECF No. 10) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 11).

<u>Background</u>

    On January 18, 2012, Aishia Nicole Ford, Claimant, applied for disability and disability insurance benefits (DIB) under Title II and supplemental social security income (SSI) under Title XVI, alleging disability beginning January 1, 2008.  The claims were denied initially on April 11, 2012, and upon reconsideration on July 18, 2012.  On August 31, 2012, Claimant filed a request for a hearing before an Administrative Law Judge (ALJ).  On December 26, 2013, an ALJ presided over a video hearing in Charleston, West Virginia.  Claimant appeared in Parkersburg, West Virginia.  On January 16, 2014, the ALJ issued a decision denying Claimant's applications for disability.  On March 14, 2014, Claimant requested review by the Appeals Council (AC).  On March 2, 2015, the AC denied Claimant's request for review, making the ALJ's decision the final

1

decision of the Commissioner.  Claimant filed the instant action seeking judicial review and requesting the remand and/or reversal of the ALJ's decision

Standard of Review

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2014).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  *Id.* § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  *Id.* § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  *Id.* § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  *Id.* § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.  *Id.*  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  *Id.* § 404.1520(e).  By satisfying inquiry four, the claimant establishes a *prima facie* case of disability.  *Hall v. Harris,* 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and

2

claimant's age, education and prior work experience.   20 C.F.R. § 404.1520(f) (2014).   The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration " must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.  Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those  sections provide as follows:

> *(c)  Rating  the  degree  of  functional  limitation.*  (1) Assessment  of  functional  limitations  is  a  complex  and  highly individualized process that requires us to consider multiple  issues and all relevant evidence to obtain a longitudinal picture of your overall  degree  of  functional  limitation.  We  will  consider  all relevant  and  available  clinical  signs  and  laboratory  findings,  the effects  of  your  symptoms,  and  how  your  functioning  may  be affected by  factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2)      We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your  ability  to  function  independently,  appropriately,  effectively, and  on a  sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic  limitations,  the  amount  of  supervision  or  assistance  you require,  and  the  settings  in  which  you  are  able  to  function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider

when we rate the degree of your functional limitation.

(3)     We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4)     When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of none or mild in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and none in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be

documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council
> levels, the written decision issued by the administrative law judge
> and the Appeals Council must incorporate the pertinent findings and
> conclusions based on the technique. The decision must show the
> significant history, including examination and laboratory findings,
> and the functional limitations that were considered in reaching a
> conclusion about the severity of the mental impairment(s). The
> decision must include a specific finding as to the degree of
> limitation in each of the functional areas described in paragraph
> (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date of January 1, 2008, and meets the insured status requirements of the Social Security Act through June 30, 2008 (Tr. at 11).  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of cyclothymic disorder, depressive disorder NOS and anxiety disorder. (*Id.*)  At the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled the level of severity of any listing in Appendix 1 (Tr. at 12).  The ALJ then found that Claimant has a residual functional capacity to perform a full range of work at all exertional levels (Tr. at 13).  However, Claimant was limited to understanding, remembering and carrying out simple instruction.  Claimant was limited to occasional interaction with the public. The ALJ found that Claimant has no past relevant work therefore transferability of job skills is not an issue (Tr. at 15).  The ALJ concluded that through the date last insured, considering Claimant's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could have performed.  Consequently, Claimant was found not under a disability at any time from January 1, 2008, the alleged onset date,

through June 30, 2008, the date last insured (Tr. at 16).

Confusingly, the ALJ performed a separate sequential evaluation in the same decision regarding Claimant's alleged impairments beginning January 18, 2012, when she filed her application for supplemental security income (SSI) (Tr. at 16). The ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date of January 1, 2008, and meets the insured status requirements of the Social Security Act through June 30, 2008. (*Id.*) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments cyclothumic disorder, depressive disorder NOS, anxiety disorder, degenerative disc disease of the lumbar spine, lumbar disc space narrowing, chronic left L5 radiculopathy, right wrist tenosynovitis, migraine headaches and hallux valgus deformity of the right foot. At the third inquiry, the ALJ concluded that beginning January 18, 2012, Claimant did not have an impairment or combination of impairments that met or medically equaled the level of severity of any listing in Appendix 1 (Tr. at 17). The ALJ then found that, beginning January 18, 2012, Claimant has a residual functional capacity to perform light level of work (Tr. at 19). However, Claimant can never perform climbing of ladders, ropes or scaffolds and crawling. She can occasionally perform balancing, kneeling, stooping, crouching and climbing of ramps and stairs. She must avoid concentrated exposure to extreme heat, extreme cold, vibration, loud noise and hazards such as heights and machinery. Claimant is limited to understanding, remembering and carrying out simple instructions. She is limited to occasional interaction with the public. (*Id.*) The ALJ found that Claimant has no past relevant work therefore transferability of job skills is not an issue (Tr. at 23). The ALJ concluded that considering Claimant's age, education, work experience and residual functional capacity beginning January 18, 2012, there are jobs that exist

in significant numbers in the national economy that she can perform.  (*Id.*)  On the basis that

Claimant has not been under a disability from January 18, 2012, the filing date of her supplemental

security income application, through the date of the decision, benefits were denied (Tr. at 24).

## Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying

the claim is supported by substantial evidence.  In *Blalock v. Richardson*, substantial evidence was

defined as:

> "evidence which a reasoning mind would accept as sufficient to
> support a particular conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less than a
> preponderance. If there is evidence to justify a refusal to direct a
> verdict were the case before a jury, then there is 'substantial
> evidence.'"

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d

640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving

conflicts in the evidence.  *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless,

the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize

the record as a whole to determine whether the conclusions reached are rational."  *Oppenheim v.

Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner in this case is not

supported by substantial evidence.

## Claimant's Background

Claimant was born on October 20, 1985.  On the date of the hearing, she was unmarried

and lived alone with her two children.  Claimant did not have a driver's license because she lost it

two years prior due to unpaid traffic tickets (Tr. at 36-37).  She testified that she was 5 foot 5

inches tall and weighed approximately 155 pounds (Tr. at 36). Claimant stated that she sometimes attended church and went to the store once a month but would experience anxiety (Tr. at 58-59).

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the ALJ erred in failing to include limitations in his controlling hypothetical question and residual functional capacity (RFC) to account for the moderate limitations in Claimant's concentration, persistence or pace, which he found to exist (ECF No. 10). Also, Claimant argues that the ALJ's RFC finding is not supported by substantial evidence. (*Id.*) Claimant argues that the ALJ failed to explain how Claimant's severe impairment of right wrist tenosynovitis would affect his ability to perform work. Defendant asserts that substantial evidence supports the ALJ's RFC assessment and that Claimant has not proven she is disabled under the Social Security Act (ECF No. 11). Defendant specifically avers that the ALJ's RFC assessment accounted for the entirety of Claimant's credibly established mental limitations and that substantial evidence supports the ALJ's assessment of Claimant's wrist pain "which, [Claimant] admitted, was completely ameliorated with steroid injections.

<u>Medical Record</u>

The Court adopts the medical record findings asserted in the motion by Claimant and Defendant's brief to the extent as follows (ECF Nos. 10 & 11):

> Plaintiff was diagnosed with De Quervain's tenosynovitis in or around February 2011 (Tr. 301). Plaintiff's mental status examinations in 2012 and 2013 were largely normal, and consistently indicated that she had relevant thought content; clear thought process and speech; was oriented; exhibited normal psychomotor activity; had fair insight and judgment; and intact recent and remote memory (Tr. 354-55, 378-393, 398-99, 402-405, 494-95, 501, 504, 553, 554). Notably, in February 2012, Plaintiff reported that she was "not too bad," and that her moods were good (Tr. 354).

8

In April 2012, Chester Frethiem, Psy.D., a State agency expert psychological consultant, reviewed the relevant evidence and opined that through June 30, 2008, Plaintiff's date last insured, she had no medically determinable mental impairment (Tr. 83). He also reviewed the relevant evidence for purposes of Plaintiff's SSI claim, completed a psychiatric review technique form (PRTF), and opined that as of January 2012, Plaintiff had no restriction in her activities of daily living; no difficulties maintaining social functioning; no difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation each of extended duration (Tr. 76).

In May 2012, Plaintiff reported that her biggest problem was staying on task and getting things done (Tr. 390). In July 2012, Frank Roman, Ed.D., a State agency expert psychological consultant, reviewed the relevant evidence and completed a PRTF, and affirmed the findings of Dr. Frethiem as written (Tr. 90-91).

In August 2012, Plaintiff reported that she felt good; was sleeping well; had a big appetite; that her medications were working well and that her mood was stable (Tr. 381). In November 2012, Plaintiff reported that her attention span and concentration were fine; her medications worked well; and her mood was stable (Tr. 405). In January 2013, Plaintiff requested to go back on Restoril (Tr. 400), and in February 2013, Plaintiff reported that she was happy on her medications, and had no new concerns despite some family drama (Tr. 398-99). In March 2013, Plaintiff reported that she was sleeping well even without Restoril; that her moods were even on Zyprexa; that her anxiety was controlled; and that she did not feel the need to be medicated (Tr. 553).

In August 2012, Plaintiff was examined by Kelly E. Lindsay, M.D. (Tr. 411). At that time, Plaintiff complained of right wrist pain, and reported that she had a hard time lifting anything with her wrist, but denied any numbness or tingling (Tr. 411). On examination, she had tenderness along the radial wrist, a positive Finkelstein's test (used to diagnose De Quervain's tenosynovitis), and decreased grip strength with thumb opposition (Tr. 411). Dr. Lindsay gave Plaintiff a De Quervain's tenosynovitis injection (Tr. 411).

In February  2013, Plaintiff reported that her wrist had improved as a result of the injection (Tr. 406).   Four months later, on June 8, 2013, Plaintiff presented to the Emergency Department at Marietta Memorial Hospital with complaints of right wrist pain that began while she was fixing her hair (Tr. 563, 567).   An examination revealed no abrasions, and intact range of motion, but some mild swelling and tenderness in the right wrist and positive

Finkelstein's test (Tr. 566).  Plaintiff was given a splint, Prednisone, and pain medication (Tr. 566).

On June 19, 2013, Plaintiff returned to Dr. Lindsay. Plaintiff had a positive Finkelstein's test and tenderness along the radial aspect of her wrist.  Dr. Lindsay gave her another De Quervain's injection (Tr. 474).

<u>Discussion</u>

Claimant asserts that the ALJ failed to consider all of the relevant evidence in the record, and therefore, the ALJ's finding that Claimant was capable of performing light work unencumbered by additional manipulative limitations is not based on substantial evidence (ECF No. 10).  A RFC represents the most that an individual can do despite his or her limitations or restrictions. *See* Social Security Ruling 96-8p, 1996 WL 374184, *1 (July 2, 1996). Pursuant to SSR 96-8p, the RFC assessment must be based on all of the relevant evidence in the case record, including the effects  of treatment and the limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication. The Ruling requires that the ALJ conduct a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.*  This function-by-function analysis enables the ALJ to determine whether a claimant is capable of performing past relevant work, the appropriate exertional level for the claimant, and whether the claimant is "capable of doing the full range of work contemplated by the exertional level." *Id.* Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. § 404.1545(a) (2015). " This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." *Id.* "In

10

determining the claimant's residual functional capacity, the ALJ has a duty to establish,  by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996).

<u>Five-Step Sequential Evaluation</u>

In a recent decision by the United States Court of Appeals for the Fourth Circuit, *Monroe v. Colvin*[1], the court provided the following discussion regarding the ALJ's RFC assessment within the five-step sequential evaluation in making a disability determination:

> In determining a claimant's RFC, the ALJ must consider "all of [the claimant's] medically determinable impairments of which [the ALJ is] aware, including those not labeled as severe at step two. *Mascio*, 780 F. 3d at 635 (quoting C.F.R. § 416.945(a)(2)). He also must "consider all [the claimant's] symptoms, including pain, and the extent to which [his] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a); see 20 C.F.R. § 416.929(a).  "When the medical signs or laboratory findings show that [the claimant] has a medically determinable impairment that could reasonably be expected to produce [his] symptoms, such as pain, [the ALJ] must then evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [his] symptoms limit [his] capacity for work." 20 C.F.R. § 404.1529(c)(1), 416.929(c)(1).
>
> Once the ALJ has determined the claimant's RFC, the ALJ then proceeds to step four, where the burden rests with the claimant to show that he is not able to perform his past work. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Mascio*, 780 F.3d at 635.  If he successfully makes that showing, the process proceeds to step five.  *See Mascio*, 780 F.3d at 635.
>
> "At step five, the burden shifts to the Commissioner to prove by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy,' considering the claimant's residual functional capacity, age, education and work experience."  *Id.* (quoting 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c)(2), 416.1429).  "The Commissioner

---

[1] *Monroe v. Colvin*, No. 15-1098 (4th Cir. June 16, 2016).

typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* If the Commissioner satisfies that burden, then the claimant is found to be not disabled and his benefits application is denied. *See id.*

<u>Function-By-Function Analysis</u>

Social Security Ruling 96-8p "explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." It is only after the function-by-function analysis has been completed that a RFC may "be expressed in terms of the exertional levels of work." *Id.* The Court in *Mascio* noted that the ruling must include a narrative as to how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. *Id.* The Fourth Circuit further noted that a *per se* rule requiring function-by-function analysis was inappropriate "given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" *Id.*

In *Monroe*, the claimant alleged episodes of loss of consciousness and fatigue. Monroe testified that he would lose consciousness about two or three times per day and would need to take several breaks during the day because of fatigue. The ALJ found that Monroe had the severe impairments of sleep apnea and narcolepsy and concluded that Monroe's impairments could reasonably be expected to cause his claimed symptom. However, the Fourth Circuit found that the ALJ "never made specific findings about whether Monroe's apnea or narcolepsy would cause him to experience episodes of loss of consciousness or fatigue necessitating breaks in work and if so, how often these events would occur." See *Monroe*, citing SSR 96-8p, 61 Fed. Reg. at 34,

12

478 ("in all cases in which symptoms, such as pain, are alleged, the RFC assessment must …

[i]nclude a resolution of any inconsistencies in the evidence as a whole" and "[s]et forth a logical

explanation of the effects of the symptoms, including pain, on the individual's ability to work").

The ALJ concluded that Monroe was capable of light work, with exceptions the ALJ identified,

and that the claimant's alleged symptoms were not credible to the extent they are inconsistent

with the RFC the ALJ identified.

      The Fourth Circuit stated in the *Monroe* opinion:

> We have not adopted a rule of per se reversal for errors in expressing the RFC before analyzing the claimant's limitation function by function. *See Mascio*, 780 F.3d at 636. However, we have held that "remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (alterations and internal quotation marks omitted). We conclude that this is just such a case.

>     Because the ALJ never determined the extent to which Monroe actually experienced episodes of loss of consciousness and extreme fatigue, we cannot determine whether the hypothetical questions posed to the VE, [vocational expert], included all of Monroe's functional limitations, as they needed to do in order to be useful. *See Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) ("In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." (alteration and internal quotation marks omitted)). On remand, the ALJ will need to consider Monroe's narcolepsy and apnea, and all of his other physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect his ability to work. Only once the ALJ has conducted such an analysis will he be able to move on to steps four and five, concerning Monroe's ability to perform past work and his ability to perform other work that exists in significant numbers in the national economy. *See Mascio*, 780 F.3d at 636.

<u>Claimant's RFC</u>

In the present case, the ALJ found Claimant's severe impairments to include right wrist tenosynovitis (Tr. at 16).   The ALJ found that "The claimant's right wrist tenosynovitis is evaluated under Section 1.02B[2] of the Listings.   However, the claimant has no evidence of inability to perform fine and gross movements as required to meet or equal the listing" (Tr. at 17).   The ALJ stated that his RFC finding that Claimant can perform work at the light exertional level is based on consideration of the entire record (Tr. at 19).   However, Claimant asserts that the ALJ failed to explain how her severe impairment of right wrist tenosynovitis would affect Claimant's ability to perform work (ECF No. 10).   Claimant argues that the ALJ failed to consider all relevant evidence in the record by finding that Claimant was capable of performing light work[3] "unencumbered by additional manipulative limitations." (*Id.*) As a result, Claimant asserts that the ALJ's RFC is not based on substantial evidence.

In response, Defendant asserts the following:

> Plaintiff was diagnosed with De Quervain's tenosynovitis in or around February 2011 (Tr. 301).   In August 2012, Plaintiff was examined by Kelly E. Lindsay, M.D. (Tr. 411).   At that time, Plaintiff complained of right wrist pain, and reported that she had a hard time lifting anything with her wrist, but denied any numbness

---

[2]  The quote provided is the only discussion by the ALJ of Listing 1.02B (Tr. at 17).

[3]  The regulations define light work, in part, as:

> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.   Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.   To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.   20 C.F.R. § 404.1567(b).

Additionally, Social Security Ruling 83-10, 1983 SSR LEXIS 30 at *14, explains that light jobs "require use of arms and hands to grasp and to hold and turn objects." *Id.*

14

or tingling (Tr. 411).  On examination, she had tenderness along the radial wrist, a positive Finkelstein's test (used to diagnose De Quervain's tenosynovitis), and decreased grip strength with thumb opposition (Tr. 411).  Dr. Lindsay gave Plaintiff a De Quervain's tenosynovitis injection (Tr. 411).

In February 2013, Plaintiff reported that her wrist had improved as a result of the injection (Tr. 406).   Four months later, on June 8, 2013, Plaintiff presented to the Emergency Department at Marietta Memorial Hospital with complaints of right wrist pain that began while she was fixing her hair (Tr. 563, 567).   An examination revealed no abrasions, and intact range of motion, but some mild swelling and tenderness in the right wrist and positive Finkelstein's test (Tr. 566).  Plaintiff was given a splint, Prednisone, and pain medication (Tr. 566).

On June 19, 2013, Plaintiff returned to Dr. Lindsay and reported that she had her last De Quervain's injection in August 2012, and had been doing well until recently (Tr. 474). On examination, Plaintiff had a positive Finkelstein's test and tenderness along the radial aspect of her wrist.  Dr. Lindsay gave her another De Quervain's injection (Tr. 474).  There are no further medical records concerning Plaintiff's wrist. (ECF No. 11).

The ALJ's decision stated that "Kelly E. Lindsay, M.D., noted on June 19, 2013, that the claimant had tenderness along the radial aspect of the wrist.  Dr. Lindsay stated she gave the claimant a De Quervain's tenosynovitis injection" (Tr. at 21).  Defendant's narrative, provided *supra,* discussing Claimant's medical records regarding her wrist impairment and her symptoms was not within the ALJ's decision.  Defendant's *ex post facto* discussion does not satisfy the ALJ's duty to consider all of the relevant evidence in the record and determine on a function-by-function basis on how Claimant's severe impairment of right wrist tenosynovitis affects her ability to work.

<u>Narrative Discussion</u>

Claimant testified to previously working "mostly sit-down type jobs" for small amounts of time before quitting due, in part, to physical pain in her wrists and back (ECF No. 39).  Claimant

testified that her ability to lift and be on her feet a lot was hindered due to her wrist and pack pain. She stated that lifting and being on her feet a lot would cause her to "be down for a couple days." She testified that even when performing work as a telemarketer she experiences lower back pain near the base of her spine (Tr. at 40). She testified to the pain being a "[l]ittle bit toward the tailbone." Also, Claimant testified to having severe arthritis on her left side. (Id.) She described the back pain as constant, burning and stabbing (Tr. at 41). She described leg pain as feeling like "pins and needles." Claimant testified that one of the discs in her back collapsed on a nerve. (Id.). As to injections to treat her pain, Claimant testified that the pain would be dulled for a while but that the pain medicine does not alleviate the pain completely. She testified that she fidgets a lot due to her back pain and anxiety (Tr. at 42).

Claimant testified to having De Quervain's tendonitis in the right wrist (Tr. at 44). She stated that it was not caused by an injury. She stated that she received injections which alleviated the pain completely, however, the injections only lasted "about eight months if it's not overused" (Tr. at 45). Claimant testified to using her left hand to support her right hand when she lifts something and to using braces and wraps (Tr. at 46). She testified to using both hands to carry a laundry basket and to lift a gallon of milk (Tr. at 47). Claimant testified to experiencing side effects from her medications. She stated that Norco, Vistaril and Ativan cause her to feel drowsy (Tr. at 48). Claimant testified to experiencing migraines, especially when she has back pain.

Claimant testified that her pain and anxiety "is out of control" (Tr. at 49). She testified that when she has a panic attack that she experiences severe chest pain, clammy hands, sweating and fidgeting. However, Claimant stated "Currently, right now, it's controlled by medication." (Id.) She testified to having to take more of her anxiety medicine than she was supposed to which

16

resulted in her running out of the prescription before it was time to get a refill (Tr. at 51-52).
Claimant testified to also experiencing depression (Tr. at 53). She testified to having "breakdown
days" when she shuts everything out to isolate herself (Tr. at 54). She stated that sometimes her
kids don't go to school because she shuts down from depression (Tr. at 54, 57). On days when
Claimant is depressed, her son makes a bowl of cereal for him and his younger sister to eat because
Claimant is not capable of feeding them. Claimant testified to wearing a hoodie, earphones and
sunglasses when she goes grocery shopping, approximately one day a month, to deter people from
talking to her (Tr. at 59-60).

In the ALJ's decision, the ALJ's RFC assessment did not resolve all inconsistencies in the
evidence as a whole as required under SSR 96-8p. Although the ALJ found that Claimant had the
severe impairment of right wrist tenosynovitis and that Claimant's impairments could reasonably
be expected to cause her claimed symptoms, the ALJ found that "[C]laimant's statements
concerning the intensity, persistence and limiting effect of these symptoms are not entirely
credible" (Tr. at 20). The ALJ concluded that "Although the claimant's right wrist problem would
contribute to lifting and carrying limitations, there is no evidence that she has any manipulative
limitation" (Tr. at 21).

Social Security Ruling 96-8p explains that the RFC "'assessment must include a narrative
discussion describing how the evidence supports each conclusion, citing specific medical facts
(e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'"
*Monroe* (citing *Mascio* (quoting SSR 96-8p, 61 Fed. Reg. at 34, 478; see also *Clifford v. Apfel*,
227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical
bridge from the evidence to his conclusion"). The Fourth Circuit has held that "[a] necessary

17

predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013).

The ALJ in the present case failed to "build an accurate and logical bridge from the evidence to his conclusion" that Claimant "is not fully credible" (Tr. at 20).  Although the ALJ provides that Claimant has no evidence of inability to perform fine and gross movements as required to meet or equal Listing 1.02B concerning Claimant's severe impairment of right wrist tenosynovitis, the ALJ did not explain how the lack of evidence for the specific function demonstrates that Claimant did not suffer from the symptoms she alleged.

This Court proposes that the District Judge find that the ALJ's decision lacks the specific analysis to explain his decision to discredit Claimant's asserted symptoms. This Court further proposes that pursuant to the holding in *Monroe*, the District Judge find that ALJ failed to provide a well-reasoned narrative for her RFC assessment. Therefore, the undersigned respectfully recommends that the District Judge find that the ALJ's opinion lacks the analysis and narrative discussion that would allow for meaningful review.  This Court makes no recommendation as to Claimant's remaining arguments regarding the insufficiency of the ALJ's hypothetical question at the hearing to the VE and the ALJ's accountability within the RFC for the moderate limitations in Claimant's concentration, persistence or pace.  These issues may be addressed on remand.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the Plaintiff's Brief in Support of Motion for Judgment on the Pleadings (ECF No. 10) to the extent Plaintiff seeks remand pursuant to sentence four of 42 U.S.C. § 405(g), **DENY** the Defendant's Motion for Judgment on the Pleadings (ECF No. 11), **REVERSE**

18

the final decision of the Commissioner, and **REMAND** this case for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g) and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Thomas E. Johnston.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Enter:  July 1, 2016

Dwane L. Tinsley
United States Magistrate Judge

19